UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL CURRAN,

                     Plaintiff,

- against -

LONG ISLAND RAILROAD COMPANY,

                     Defendant.

**OPINION AND ORDER**

13 Civ. 8452 (ER)

Ramos, D.J.:

      Plaintiff Daniel Curran ("Plaintiff") brings this action against Defendant Long Island Railroad Company ("LIRR") under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, for injuries suffered both while Plaintiff was drilling into a piece of buckled railroad track and subsequently during his physical therapy. LIRR has moved for summary judgment. (Doc. 9). For the following reasons, that motion is DENIED.

## I. BACKGROUND

      Plaintiff has been an LIRR employee since May 15, 2002, and worked specifically as a Signal Maintainer for roughly nine years prior to the injury he sustained on July 2, 2012. Def.'s Local Rule 56.1 Stmt. of Material Facts ("Def.'s 56.1") (Doc. 12) ¶ 3.[1] On July 2, 2012, Plaintiff was in the process of performing assigned crossing inspections when he and his partner were called to respond to a "heat kink," which is essentially a deformed, bowed out piece of track, often caused by hot temperatures and/or installation of too much track material at a particular point. *Id.* at ¶ 5; Pl.'s Rule 56 Response and Counterstatement of Facts ("Pl.'s 56.1") (Doc. 16)

---

[1] Plaintiff admits to every fact set forth in Defendant's Local Rule 56.1 Statement of Material Facts. *See* Pl.'s Response and Counter-Statement of Facts (Doc. 16) ¶¶ 1–12.

¶¶ 28–31.  Plaintiff and his partner were assigned to fix the heat kink, which was located near the Cold Spring Harbor Station in Huntington, New York.  Def.'s 56.1 ¶ 5.  The assignment required use of a Cembre Rail Drill (the "drill") to drill a hole in the rail.  *Id.* at ¶ 6.  Another employee initially set up the drill and carried it over to clamp it to the rail.  *Id.* at ¶ 11.  Plaintiff began to drill, but soon thereafter the drill bit broke off, and Plaintiff had to unclamp the drill from the rail, carry it roughly twelve to fifteen feet outside the ambit of the track gauge, replace the drill bit, and then carry the drill back to re-clamp it to the rail.  *Id.* at ¶¶ 7–8.  The drill itself weighed forty to fifty pounds.  *Id.* at ¶ 14.  After carrying it back over, Plaintiff re-clamped the drill to the rail, "stood over the drill, feet spread apart, bending from the waist, and turned the handle" to advance the drill bit into the rail, while the drill itself remained stationary.  *Id.* at ¶ 9.  Plaintiff drilled one hole into the rail, and, after drilling that hole, Plaintiff "felt a sharp pain and a discomfort trying to stand up erect."  *Id.* at ¶¶ 10, 12.  An MRI on August 2, 2012 confirmed that Plaintiff suffered a herniation in his lower back.  Pl.'s 56.1 ¶ 91.  Plaintiff admits that lifting and carrying rail drills is an "essential physical activity" required of a Signal Maintainer.  Def.'s 56.1 ¶ 15.  He does not allege that the drill was defective in any way.

Following his injury, Plaintiff was assigned two physical therapists within LIRR's medical department, John Byrne ("Byrne") and Frederic Ho ("Ho"), both LIRR employees.  Pl.'s 56.1 ¶ 52.[2]  Byrne and Ho supervised Plaintiff's participation in LIRR's "Work Hardening" program (the "program"), a physical-therapy regimen that includes an "an exercise program for reconditioning, strengthening, [and] functional training."  *Id.* at ¶¶ 52–60.  Byrne and Ho would identify individual employees who required "selective specialized exercises" in order to return to

---

[2] In laying out the facts regarding his physical therapy in his Rule 56.1 statement, Plaintiff marshals specific citations to the record for each fact.  Defendant has not submitted a counterstatement admitting or denying these facts, nor does Defendant dispute any of these facts in its reply brief.  The Court will thus treat these facts as undisputed for purposes of the motion.

work. *Id.* at ¶ 63.  The program was voluntary and Byrne would design an individualized program based on his evaluation of the employee's abilities and the strengthening the employee required to get back to work. *Id.* at ¶¶ 61, 64.  Byrne and Ho were not medical doctors, and did not discuss treatment strategy with Plaintiff's doctor. *Id.* at ¶¶ 65, 68, 92–95.  Byrne and Ho had complete control over the contours, duration, and specific types of exercises constituting a given employee's program, and were free to alter the particulars as the program progressed if an employee was not improving in certain areas. *Id.* at ¶¶ 70–73, 76–81.

      Plaintiff's particular program, begun in August 2012, was intended to address his herniation and other conditions of his back more generally. *Id.* at ¶ 99.  On September 5, 2012, Plaintiff commenced lifting exercises in which he lifted ten, eleven, fifteen, and then twenty pounds of weight. *Id.* at ¶ 105.  On September 7, 2012, Byrne moved Plaintiff up to forty pounds of weight, but on September 10, 2012, Byrne's notes stated that Plaintiff reported "exacerbation of pain in his low back which worsened" on September 7 and "hasn't abated since that time," as well as "stabbing pain, which he hadn't experienced in several weeks." *Id.* at ¶¶ 102–07.  After cutting back weight-based exercises, Byrne slowly reintroduced weight-lifting into Plaintiff's routine over the next week and a half.  On September 24, 2012, Plaintiff again was directed to lift thirty, forty, and fifty pounds of weight, despite having complained to Byrne about increased pain in his pelvic area and left leg on September 21, 2012. *Id.* at ¶¶ 108–13.  On September 28, 2012, which was a Friday, Plaintiff progressed to lifting forty, fifty, and sixty pounds, and the following Monday, October 1, 2012, Byrne's notes indicate that Plaintiff reported "increased pain over weekend." *Id.* at ¶¶ 119–20.  The October 1, 2012 session was Plaintiff's last, and he cancelled forthcoming sessions because he and Byrne agreed that the program was "too much" for Plaintiff. *Id.* at ¶ 121.

Byrne and Ho did not report to Plaintiff's treating orthopedist at any time during Plaintiff's participation in the program. *Id.* at ¶ 117. Both men had complete discretion in crafting Plaintiff's weight-lifting regime. *Id.* at ¶ 123. Both men knew Plaintiff had a herniation in his back prior to Plaintiff's starting the program. *Id.* at ¶ 126. Plaintiff now asserts that he was negligently treated on September 7, 2012 and over the four-day span from September 28 to October 1, 2012. *Id.* at ¶ 132.

## II. LEGAL STANDARDS

### A. Summary Judgment

To prevail on summary judgment, the movant must show that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. ("FRCP") 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'" *Id.* "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Like here, where "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322–23). If the moving party meets its

4

burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322–23). In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

### B. FELA

"The ordinary summary judgment standard is considerably more plaintiff-friendly in FELA cases." *Kendall v. Metro-N. Commuter R.R.*, No. 12 Civ. 6015 (DLC), 2014 WL 1885528, at *2 (S.D.N.Y. May 12, 2014). "In FELA cases, the standard for summary judgment is 'liberally construed' in light of the 'strong federal policy in favor of letting juries decide cases arising under FELA.'" *Vasquez v. Metro-N. Commuter R.R.*, No. 12 Civ. 7390 (JPO), 2014 WL 1344597, at *1 (S.D.N.Y. Apr. 4, 2014) (quoting *DeRienzo v. Metro. Transp. Auth.*, 237 F. App'x 642, 644 (2d Cir. 2007)). "Accordingly, a FELA case 'must not be dismissed at the summary judgment phase unless there is *absolutely no reasonable basis* for a jury to find for the plaintiff.'" *Kendall*, 2014 WL 1885528, at *2 (quoting *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 828 (2d Cir. 1994)) (emphasis added).

Under FELA, "[e]very common carrier by railroad while engaging in [interstate commerce]…shall be liable in damages to any person suffering injury while he is employed by such carrier…for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars…, machinery, track…, or other equipment." 45 U.S.C. § 51. There

is no dispute that LIRR is a common carrier engaging in interstate commerce and thus subject to FELA, or that Plaintiff suffered injuries while employed by LIRR and acting within the scope of his employment. The core dispute is whether Plaintiff's injuries resulted "in whole or in part" from any negligence on the part of LIRR's officers, agents, or employees.

"In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (citing *Sinclair v. Long Island R.R. Co.*, 985 F.2d 74, 77 (2d Cir. 1993)). "Courts apply a more relaxed standard of both negligence and causation to FELA negligence claims than to those arising under common law." *Coale v. Metro-N. Commuter R.R. Co.*, 621 F. App'x 13, 14 (2d Cir. 2015) (citing *Rogers v. Mo. Pac. R.R.*, 352 U.S. 500, 506 (1957); *Williams v. Long Island R.R.*, 196 F.3d 402, 406 (2d Cir. 1999)). FELA is not a strict liability statute and a railroad is not an insurer for its employees, so Plaintiff must submit some evidence to support a finding of negligence—but jurors have "more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." *Id.* (citing *Williams*, 196 F.3d at 407; *Ulfik v. Metro–N Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996)).

"It is [indisputable] that [the LIRR] had a duty to provide its employees with a safe workplace." *Tufariello*, 458 F.3d at 91 (citation and internal quotation marks omitted). "The question is whether it breached that duty. Under FELA, the LIRR did so if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees," including Plaintiff. *Id.* (citation and internal quotation marks omitted); *see also DeRienzo*, 237 F. App'x at 645 (citing *Ulfik*, 77 F.3d at 58). "Elements that a trier of fact may consider in determining whether a risk is unreasonable…are (1) the likelihood

that harm will eventuate and (2) the cost of preventing that harm, including the loss of any benefits the risk-creating behavior might yield." *Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 37–38 (S.D.N.Y. 2008).

The standard for causation in FELA actions is particularly liberal. "FELA's language on causation…is as broad as could be framed," and thus, "in comparison to tort litigation at common law, a relaxed standard of causation applies under FELA." *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011) (citations and internal quotation marks omitted). At the summary judgment stage, "'the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence *played any part, even the slightest*, in producing the injury or death for which damages are sought.'" *Id.* (quoting *Rogers*, 352 U.S. at 508) (emphasis added). Thus, Plaintiff need only point to evidence to support a finding that LIRR's negligence played a part—"no matter how small"—in bringing about his injury. *Id.* at 2644. "As clarified by the Second Circuit, in the ordinary FELA case, '[c]ircumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred.'" *Kendall*, 2014 WL 1885528, at *5 (quoting *Ulfik*, 77 F.3d at 60).

### III. DISCUSSION

Plaintiff alleges three claims of negligence under FELA. The first relates to LIRR's alleged failure to provide Plaintiff with a safe work space by negligently maintaining the track in a manner that allowed the heat kink to form. The second and third relate to the alleged negligent medical treatment performed by Byrne and Ho on, respectively, September 7, 2012 and September 28 to October 1, 2012. As explained further below, disputed issues of fact exist with regard to all three claims.

### A. Heat Kink Claim

Relying extensively on the deposition testimony of Jeffrey Greabell ("Greabell"), who worked as an Assistant Supervisor in LIRR's Track Department on July 2, 2012 and responded to the scene of the heat kink at issue here, Plaintiff argues that LIRR was "negligent in bringing about the heat kink."  Pl.'s Mem. L. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") (Doc. 15) 5; Affidavit of Marc T. Wietzke ("Wietzke Aff.") (Doc. 15, Ex. 1), Ex. A ("Greabell Tr.").  First, Greabell testified that the original installation of the track contained too much rail for that section.  Pl.'s 56.1 ¶ 34 (citing Greabell Tr. at 41).  Second, according to Greabell, before the heat kink was reported, a maintenance crew had been working on that portion of the track to replace cracked railroad ties.[3]  *Id.* at ¶ 36 (citing Greabell Tr. at 45).  Replacing a cracked tie entails a process called "cribbing out," in which the ballast[4] that undergirds the track is dug out from under the tie, temporarily leaving an empty "crib" through which the cracked tie is swapped out for a replacement tie, only to be filled back in once the new tie is secured in place.  *Id.* at ¶ 27 (citing Greabell Tr. at 20–21).  Greabell testified that LIRR leaves it to the discretion of their track supervisors to determine how many empty "cribs" can safely exist at one time in a given section of track, and that at the time the heat kink occurred, there were eight empty "cribs" in the section in which the heat kink formed, dug out in between the sixteen cracked ties still in need of replacement.  *Id.* at ¶¶ 38–39 (citing Greabell Tr. at 46–47, 58).  The existence of the eight empty "cribs" in one section of the track reduced the structural support for the rail in that section, according to Greabell, and all else equal, reducing track support increases the likelihood that a

---

[3] Railroad ties are the rectangular, concrete blocks that lie perpendicular to the rails.  They are part of the mechanism by which railroad tracks disperse the load from a train wheel through the rail and into the ground.

[4] Ballast is material used to disperse the load from a train wheel into the ground, to keep the track in place and symmetrical under various types of loads imposed by different rolling equipment, to provide adequate drainage for the track, and to maintain "proper track crosslevel, surface, and alinement."  *See* 49 C.F.R. § 213.103.

heat kink will form. *Id.* at ¶¶ 41–42 (citing Greabell Tr. at 51). Indeed, in the "Report of Track Disturbance" that he filled out after inspecting the heat kink, Greabell noted the cracked ties and the need for the empty "cribs" to be refilled with ballast. *Id.* at ¶¶ 44–45 (citing Wietzke Aff., Ex. B). Consistent with Greabell's testimony, Plaintiff also submits a document presenting LIRR's own recommended practices for track maintenance, which lists "disturbed track" and "sub-standard ballast section" as two conditions that could increase the possibility of "track buckling." *See id.* at ¶¶ 46–50 (citing Wietzke Aff., Ex. C, at 5–7).

Plaintiff argues that LIRR was negligent in allowing "8 separate cribs without ballast in the middle of summer in a curve with full speed train traffic." Pl.'s Opp'n at 5. Since Plaintiff only responded to the heat kink and initiated drilling on July 2, 2012 because of LIRR's negligence, Plaintiff reasons, that negligence caused Plaintiff's injuries, at least in part. *Id.*

In response, LIRR first argues that the heat kink was not a product of negligence but rather "a known recurrent track condition that arises in the normal course of track maintenance," adding that "speculation as to what may have caused or contributed to the heat kink does not create a genuine triable issue of fact." Def.'s Reply Mem. L. Supp. Mot. Summ. J. ("Def.'s Rep.") (Doc. 19) 3. The Court finds this response unavailing. Given the dangers of track buckling, most obviously train derailment, there is little doubt that LIRR must exercise reasonable care to reduce the frequency of heat kinks and that a juror could conclude that failure to do so constituted negligence. *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 966 F. Supp. 2d 270, 281 n.7 (S.D.N.Y. 2013) (noting that newspaper articles reporting derailments due to "sun kinks" made it clear that "railway companies can and should take reasonable precautionary measures to reduce the likelihood of accidents caused by a 'sun kink'"), *aff'd*, 762 F.3d 165 (2d Cir. 2014); *see also Potrykus v. CSX Transp., Inc.*, No. 09 Civ. 744 (JGC), 2010

WL 2898782, at *4 (N.D. Ohio July 21, 2010) (holding that "a reasonable jury could conclude that defendant negligently maintained the ballast in breach of its duty to provide a reasonably safe workplace") (citation omitted).  Contrary to LIRR's assertion, Plaintiff's case relies on more than bare "speculation"—a reasonable juror could easily infer from Greabell's testimony and the LIRR track-maintenance document that the heat kink resulted from LIRR's negligent track installation and/or its failure to properly support the track while replacing cracked ties.

LIRR also argues that there is no genuine issue of material fact with respect to causation, asserting, in so many words, that Plaintiff is relying an improperly expansive form of but-for causation to support his FELA claim.  *See* Def.'s Rep. at 3 ("If plaintiff…had claimed that his back had seized up upon arriving by company vehicle at the job site, would plaintiff have claimed that he was only at the job site because of the heat kink and then there was therefore a genuine triable issue of fact?").  This argument too must fail, for the "causal link" in this case closely resembles those that the United States Supreme Court has already deemed to be premised on more than but-for causation, and "hardly farfetched." *McBride*, 131 S.Ct. at 2641 n.9.  For example, the Supreme Court in *McBride* approved of the Sixth Circuit's decision to send the causation issue to the jury in *Richards v. Consol. Rail Corp.*, 330 F.3d 428 (6th Cir. 2003), where "a defective break malfunctioned en route, and the employee was injured while inspecting underneath the train to locate the problem." *McBride*, 131 S.Ct. at 2641 n.9 (citing *Richards*, 330 F.3d at 431, 437).[5]  As the Sixth Circuit put it in *Richards*, the question was whether a reasonable jury could find that the plaintiff's injury "was within the risk created by" the defendant's negligence, and therefore, "if as a result of [negligence] a plaintiff is required to take

---

[5] *Richards* was a case brought under the Federal Safety Appliances Act, but the Sixth Circuit explicitly extended its reasoning to apply in FELA cases as well, *Richards*, 330 F.3d at 437, and *McBride*, which approved of *Richards*, was also a FELA case, 131 S.Ct. at 2634.

certain actions and he or she is injured while taking those actions, the issue of causation generally should be submitted to a jury." *Richards*, 330 F.3d at 437. That principle from *Richards* could easily guide a reasonable jury in this case, leading to a finding that LIRR's negligence in fomenting the heat kink required Plaintiff to perform the very repair job during which he injured himself. *Cf., e.g.*, *Eggert v. Norfolk & W. Ry. Co.*, 538 F.2d 509, 512 (2d Cir. 1976) (finding triable issue where railroad negligently failed to repair engine cab's seat and, as a result of having to move around cab instead of being able to swivel in chair, plaintiff injured himself when engine jolted while he was standing up); *Page v. Nat'l R.R. Passenger Corp.*, 28 A.3d 60, 74–75 (Md. App. 2011) (applying *Richards* to find triable issue where railroad police officer injured himself while fulfilling his duty to clear baggage cart negligently left on track).[6]

Given FELA's permissive standards and the record evidence here, the jury would have a reasonable basis to conclude that LIRR was negligent in allowing the heat kink to form, which played at least some part in Plaintiff's injuring his back while repairing that very heat kink.

---

[6] *Richards* also discussed a number of cases with analogous causal links, all of which were submitted to the jury. 330 F.3d at 435–36 (discussing *N.Y., New Haven & Hartford R.R. Co. v. Leary*, 204 F.2d 461 (1st Cir. 1953); *Warning v. Thompson*, 249 S.W.2d 335 (Mo. 1952); *Hendrick v. CSX Transp., Inc.*, 575 So. 2d 709 (Fla. Dist. Ct. App. 1991)). Additionally, the Supreme Court in *McBride* expressly approved of *Norfolk S. Ry. Co. v. Schumpert*, 608 S.E.2d 236, 238–39 (Ga. App. 2004), in which a coupling device fell off due to a negligently absent pin, and the plaintiff was injured while replacing that device. *McBride*, 131 S.Ct. at 2641 n.9. These cases stand in contrast to significantly more tenuous chains of causation that approach invocation of but-for reasoning. *See, e.g.*, *Nicholson v. Erie R.R. Co.*, 253 F.2d 939, 940–41 (2d Cir. 1958) (finding no triable causation issue where female employee working in railroad's shop, faced with railroad's negligent failure to provide a female restroom within the shop, was injured by passenger's suitcase while she looked for female restroom on stationary train); *see also McBride*, 131 S.Ct. at 2643 (describing *Nicholson* as a case involving a "far out 'but for' scenario[]"); *Niederhofer v. Ill. Cent. R.R. Co.*, No. 5–10–0392, 2011 WL 10501267, at *5 (Ill. App. 2011) (analogizing to *Nicholson* and concluding that railroad's negligence for failure to clear accumulated snow and ice was "sufficiently disconnected" from plaintiff's injury, which occurred when plaintiff's repair truck suffered minor crash due to snow and ice, and plaintiff hurt his knee when disembarking because last step of truck was closer to ground than usual due to crash). The Sixth Circuit in *Richards* itself suggested, in a footnote, that even if the employee was required to get out and inspect the defective brake, were he to be "attacked by a rabid dog" or injure himself during a walk while waiting for the brake to be repaired, "[a] court reasonably could find no causation as a matter of law in these situations." *Richards*, 330 F.3d at 437 n.5.

There thus remain genuine factual issues, and LIRR's motion for summary judgment on Plaintiff's first claim is denied.[7]

### B. Physical Therapy Claims

Plaintiff's next two claims relate to two separate instances during which Plaintiff attended LIRR's "work hardening" program. Plaintiff argues that the evidence demonstrates LIRR provided "inadequate medical treatment aggravat[ing] a known physical condition," and that "this aggravation acted in conjunction with negligent supervision and assignment to produce a traumatic physical injury." Pl.'s Opp'n at 5.

Although the two supervisors, Byrne and Ho, were not medical doctors, it is undisputed that they were providing medical-related services to Plaintiff at the behest of and for the benefit of LIRR. This case thus fits comfortably within the category of cases in which a railroad can be held liable for the negligence of its employee-doctor. *See O'Donnell v. Pa. R.R. Co.*, 122 F. Supp. 899, 902 (S.D.N.Y. 1954) ("[A] railroad may, under the Federal Employers' Liability Act, be liable for the negligence of a doctor in its employ, despite the fact that the doctor must inevitably exercise professional discretion in the examination and treatment of patients."). Although "a railroad has no duty to ascertain whether an employee is physically fit for his job,…if it undertakes to give physical examinations, it is liable if it performs such undertaking negligently." *Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir. 1980) (citing *Isgett v. Seaboard Coast Line R.R. Co.*, 332 F. Supp. 1127, 1141 (D.S.C. 1971)); *see also Walsh v.*

---

[7] LIRR repeatedly makes reference to the fact that carrying and operating a rail drill was "within the essential physical activities required" of an LIRR employee in Plaintiff's position. *See, e.g.*, Def.'s Rep. at 2. To the extent LIRR is attempting a defense resembling assumption-of-the-risk, the Court notes that the FELA statute explicitly abrogates this defense in FELA actions. *See* 45 U.S.C. § 54.

*Consol. Rail Corp.*, 937 F. Supp. 380, 391 (E.D. Pa. 1996) (identifying "the railroad's duty to conduct its medical examinations with the appropriate level of care").

LIRR does not defend the specific programmatic decisions that Byrne and Ho made with respect to Plaintiff, nor does it argue that Byrne and Ho were not LIRR employees acting outside the scope of their employment when they supervised Plaintiff's program.  Rather, LIRR contends only that Plaintiff's two claims related to his physical therapy "must be dismissed if the first cause of action arising out of the initial claim of injury on July 2, 2012 is dismissed on summary judgment."  Def.'s Rep. at 4; *see also* Def.'s Mem. L. Mot. Summ. J. (Doc. 11) 7 (arguing that dismissal of first claim breaks the "link" between Plaintiff's back injury and later negligence at medical facility).[8]  The Court has not dismissed Plaintiff's first claim, but even if it had, there is no basis for LIRR's position that such a dismissal would mandate the same fate for Plaintiff's second and third claims.  There is no good reason why a railroad's duty of care when providing medical treatment exists *only* when that treatment aggravates a prior condition *previously caused by the railroad's negligence. Cf. Green v. Kansas City S. Ry. Co.*, 464 F. Supp. 2d 610, 620 (E.D. Tex. 2006) (finding triable issue as to whether physician, as agent for railroad, negligently ruptured plaintiff's eardrum while cleaning out previous buildup in plaintiff's ear); *O'Donnell*, 122 F. Supp. at 901 (affirming jury verdict finding negligence by railroad-employed doctor based on treatment of plaintiff's pre-existing eye irritation suffered while on duty).

Here, Plaintiff has marshalled evidence showing that Byrne and Ho had blanket discretion over Plaintiff's progression through the program, that Byrne and Ho knew about Plaintiff's original back injury, and that Plaintiff further aggravated his back while following

---

[8] LIRR also makes the factual point that the program Plaintiff undertook was voluntary and that "he could, and did, discontinue participating in the program," Def.'s Rep. at 4, but nowhere does LIRR explain why Plaintiff's voluntary undertaking would insulate LIRR from FELA negligence liability in providing that program.

Byrne and Ho's instructions, despite complaining about his back pain. LIRR disputes none of this. There is thus a reasonable basis for a jury to find that LIRR is liable for Byrne and Ho's negligence in instructing Plaintiff to undertake exercises that caused him to aggravate his back injury. *See, e.g., Dunn v. Conemaugh & Black Lick R.R.*, 267 F.2d 571, 577 (3d Cir. 1959) (determining that record in FELA case justified a "jury finding that [railroad's doctor] was negligent in certifying the plaintiff to strenuous labor some seven weeks after drastic surgery in view of his knowledge of that surgery and the nature of the work for which he certified the plaintiff").

### IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED. The parties are directed to appear for a status conference on **March 11, 2016, at 10:30 AM**.

The Clerk of the Court is respectfully directed to terminate the motion (Doc. 9).

It is SO ORDERED.

Dated:   February 9, 2016
         New York, New York

                                                        _____
                                                        Edgardo Ramos, U.S.D.J.